1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

9

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 PERRY ROBERT AVILA, | ) Case No.: 1:10-cv-01208 JLT |
| 12        Plaintiff, | ) |
| 13 | ) ORDER DISMISSING COMPLAINT<br>) WITHOUT LEAVE TO AMEND |
| 14   v. | ) |
| 15 MATTHEW CATE, et al., | ) (Doc. 1) |
| 16        Defendants. | ) |
| 17 | ) |

18        Perry Robert Avila ("Plaintiff") is proceeding *pro se* and *in forma pauperis* in this civil

19 rights action against California Department of Corrections and Rehabilitation (CDCR) Secretary

20 Matthew Cate, California State Prison-Corcoran (CSP-C) Warden R. Lopez, and CSP-C Deputy

21 Warden of Operations M. Junious (collectively, "Defendants") pursuant to 42 U.S.C. § 1983.

22 (Doc. 1 at 1.)  Plaintiff filed his Complaint on July 6, 2010 (*Id.*) and it is now before the Court

23 for screening.

24 **I.  Screening Requirement**

25        Because Plaintiff is seeking redress from governmental employees in a civil action, the

26 Court is required to screen his complaint in order to identify cognizable claims.  28 U.S.C. §

27 1915A(a)-(b).  The Court shall "dismiss the complaint, or any portion of the complaint, if the

28 complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted;

or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); 28 U.S.C. § 1915(e)(2)(B)(I)-(iii).

## II. Pleading Standards

"Pro se documents are to be liberally construed" and "'must be held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "[They] can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id*.

Under Federal Rule of Civil Procedure 8(a), "[a] pleading that states a claim for relief must contain: (1) a short and plaint statement of the grounds for the court's jurisdiction, . . . ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought." Fed. R. Civ. P. 8(a). Each allegation must be simple, concise, and direct. Fed. R. Civ. P. 8(d)(1). While a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (internal quotation marks and citations omitted).

In analyzing a pleading, the Court should set conclusory factual allegations aside, accept all non-conclusory factual allegations as true, and determine whether those non-conclusory factual allegations accepted as true state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 1949 (internal quotation marks and citation omitted). In determining plausibility, the Court is permitted "to draw on its judicial experience and common sense." *Id*. at 1950.

## III. Plaintiff's Factual Allegations

Plaintiff alleges California prisons contain media rooms where prison employees show movies for the prison population. (Doc. 1 at 4.) He contends Title 15, Section 3220.4(b) of the California Code of Regulations (CCR) categorically prohibits the approval of films not rated G,

PG, or PG-13 by the Motion Picture Association of America (MPAA) and prohibits showing any film found to glorify violence or sex or is inflammatory to the climate of the prison, regardless of rating. (*Id*. at 5.)  He asserts these guidelines effectively ban R-, NC-17-, X-rated and unrated films. (*Id*.)

Plaintiff maintains the MPAA consists of a group of parents whose main function is to provide other parents with warnings about what movies they should and should not permit their children to see. (Doc. 1.)  An "R" rating stands for "restricted," which means those under seventeen years of age must be accompanied by a parent or adult guardian in order to view the film. (*Id*.)  In essence, Plaintiff alleges that the MPAA rating is not a proper basis for determining which movies may be shown.

Plaintiff admits that Sections 3220.4(d)(1)-(2) provides that other movies may be submitted to the Director for consideration for specified limited inmate viewing purposes. (Doc. 1 at 5)  On August 3, 2008, Plaintiff initiated a CDC 602 Prisoner Grievance seeking to amend prison regulations to remove the prohibition of movies not rated G, PG, or PG-13, because it is "unreasonable and overbroad." (Doc. 1 at 5-6.)   Also, he requested that all movies listed on the Library of Congress' National Film Registry be allowed to be shown. ( *Id*.) He claims that denial of this request demonstrates that in practice, the process outlined in § 3220.4(d)(1)-(2) does not preserve the inmates' First Amendment rights because prison officials do not actually consider allowing R-rated movies, even those that do not glorify violence or sex or inflame the prison population, to be shown. (*Id*.)  He alleges that "more process is due in respect to whether prisoners should be permitted to view films rated other than G, PG, PG-13." (*Id*.)

Plaintiff alleges that on or about November 18, 2008, Defendant Junious could have submitted Plaintiff's 602 request to view films on the National Film Registry and other films for "meaningful consideration" but elected not to do so and, instead, he "merely submitted Plaintiff's requests to the movie specialist for review." (Doc. 1.)  According to Plaintiff, Section 3220.4(b)(1)-(2) only permits the Director of the CDCR "to conduct meaningful review and grant prisoner viewing of films outside the G, PG, and PG-13 ratings." (*Id*.)

1  Plaintiff contends that on March 2, 2009, Cate had an opportunity to grant Plaintiff's

2  grievance and to exercise the discretion granted under Sections 3220.4(d)(1)-(2) to allow inmate

3  viewing of the movies on the National Film Registry but he declined to do so.  (Doc. 1)  Instead,

4  Cate acknowledged the requests, elected not to exercise the discretion, and denied the grievance

5  in all respects.  (*Id*.)

6  **IV.  Discussion and Analysis**

7  Plaintiff contends Defendants violated his rights to freedom of speech under the First

8  Amendment and due process under the Fourteenth Amendment.  (Doc. 1 at 4.)

9  **A.  42 U.S.C. § 1983 Claims**

10  Title  42, § 1983 of the United States Code provides a cause of action against

11  [e]very person who, under color of any statute, ordinance, regulation, custom, or
   usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of

12  the United States or other person within the jurisdiction thereof to the deprivation of
   any rights,      privileges, or immunities secured by the Constitution and laws . . .

13

14  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their

15  authority to deprive individuals of their federally guaranteed rights and to provide relief to

16  victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v.*

17  *Piphus*, 435 U.S. 247, 254-57 (1978)).  It does not provide any substantive rights, but rather

18  "authorizes a cause of action based on the deprivation of civil rights guaranteed by other Acts of

19  Congress."  *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979).

20  A plaintiff stating a claim under § 1983 must allege facts showing he was deprived of a

21  federal right by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988);

22  *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986); *Long v. County of Los Angeles*, 442 F.3d

23  1178, 1185 (9th Cir. 2006).  For a defendant to be liable under § 1983, a plaintiff must prove

24  there is an affirmative link between the alleged deprivation and the resulting injury.  *See Rizzo v.*

25  *Goode*, 423 U.S. 362, 371-72, 377 (1976).  An affirmative link exists when a defendant "does an

26  affirmative act, participates in another's affirmative acts, or omits to perform an act which he is

27  legally required to do that causes the deprivation of which complaint is made."  *Johnson v. Duffy*,

28  588 F.2d 740, 743 (9th Cir. 1978).

### 1.  Failure to Link

Title 42, § 1983 of the United States Code requires that there be an actual causal link between the actions of the named defendants and the alleged constitutional deprivation.  *See Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691-92 (1978); *Rizzo*, 423 U.S. at 370-71; *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980).  In order to state a § 1983 claim, a plaintiff must allege facts showing each named defendant either exhibited some sort of "direct personal participation in the deprivation" or "set[] in motion a series of acts by others which the actor [knew] or reasonably should [have known] would cause others to inflict the constitutional injury." *Johnson*, 588 F. 2d at 743-44.  The complaint must specifically allege how each named defendant is liable for the claimed deprivation.

In this case, Plaintiff names Cate, Lopez, and Junious as defendants (Doc. 1 at 1); however, Plaintiff fails to even mention Lopez within the body of the Complaint, let alone attribute specific constitutional violations to him.  In addition, Plaintiff fails to plead facts linking Junious to his claim of First Amendment violations.  Consequently, Plaintiff has failed to state cognizable claims for First or Fourteenth Amendment violations against Lopez and has failed to state a cognizable claim for a First Amendment violation against Junious.

### B.  First Amendment Protections – Freedom of Speech

The First Amendment prohibits Congress from making any law "abridging the freedom of speech." U.S. Const. amend. I.  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948).  Thus, the constitutional rights of prisoners are more limited in scope than those held by individuals in society at large. *Shaw v. Murphy*, 532 U.S. 223, 223 (2001).

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  When a prisoner challenges prison restrictions based upon an asserted First Amendment violation, the challenge "must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner

1    has been committed in accordance with due process of law." *Id*.  Although deference is generally

2    given to the judgments of prison officials in upholding challenged regulations, *Shaw*, 532 U.S. at

3    229, to evaluate the reasonableness of the regulation at issue, the Court must consider: (1)

4    whether there is "a valid, rational connection between the prison regulation and the legitimate

5    governmental interest put forward to justify it[;]" (2) "whether there are alternative means of

6    exercising the right that remain open to prison inmates[;]" (3) "the impact accommodation of the

7    asserted constitutional right will have on guards and other inmates, and on the allocation of

8    prison resources generally[;]" and (4) "the absence of ready alternatives" available to the prison

9    for achieving the governmental objectives.  *Turner v. Safley*, 482 U.S. 78, 89-91 (1987).

10       However, as noted above, Plaintiff makes a limited attack on the regulation.  (Doc. 1 at 7)

11   First, he challenges the reliance on the MPAA rating system to screen out movies for inmate

12   viewing. *Id*.  Alternatively, he asserts that the regulation should be amended to permit the

13   viewing of <u>all</u> movies no matter their MPAA rating unless they glorify violence, depict

14   "gratuitous" sexual conduct or would inflame the prison population but to not exclude those

15   where these scenes are "incidental or integral to the film's plot or are depictions with inherent

16   educational, intellectual, historical or cultural value."  *Id*.  Second, he seeks an order allowing all

17   films listed on the National Film Registry to be shown.  *Id*. Third, he seeks modification of the

18   appeal process for inmates who seek review of a refusal to show a particular film.  *Id*.  Notably,

19   he does not challenge the rationale for the regulation but complains that it is overbroad.

20                                  **1. Plaintiff's First Amendment Claims**

21       Plaintiff maintains "Defendants' policy of categorically prohibiting prisoner viewing of

22   R-rated films, rather than considering whether or not the films glorify sex or violence or are

23   inflammatory to the climate of the prison, prior to making a decision to approve or disapprove

24   the film" violates his First Amendment rights to freedom of speech.  (Doc. 1 at 4.)  As noted

25   above, regulations limiting prisoners' access to information are valid if they are reasonably

26   related to legitimate penological interests, *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989).

27       The regulation at issue, 15 CCR § 3220.4(b) provides,

28

Only those movies/videos which have been given a rating of "G," "PG," or "PG-13" by the Motion Picture Association of America (MPAA) or that have been placed on the department's discretionary showing list may be considered for viewing. Movies/videos which have been given a rating of other than "G," "PG," or "PG-13" by the Motion Picture Association of America shall not be approved for general inmate viewing. Regardless of their rating or listing, movies/videos which, in the opinion of the reviewer, glorify violence or sex, or are inflammatory to the climate of the facility shall not be shown.

Cal. Code Regs. tit. 15, § 3220.4 (2011).

### a. Plaintiff does not challenge that there is a valid, rational connection between the prison regulation and the legitimate governmental interest

Though Plaintiff does not challenge the underlying rationale for the regulation, it was enacted to ensure that movies shown at the prisons do not glorify sex or violence or inflame the prison population such that the "safety and security of the institution[s]" are threatened.[1,2] (Doc. 1 at 25-26) The regulation is "aimed at protecting prison security, a purpose [the Supreme Court] this Court has said is 'central to all other corrections goals.' *Pell v. Procunier*, 417 U.S., at 823." *Thornburgh,* 490 U.S. at 415. Likewise, by barring all movies that are rated "R" or higher and those which glorify sex[3] or violence or inflame the prison population, the regulation is neutral in that it does not suppress expression. *Id*.

---

[1] According to Federal Rule of Civil Procedure 10(c), an exhibit attached to the pleading "is part of the pleading for all purposes." (*Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987)). When an attached exhibit contradicts the allegations in the pleadings, the contents of the exhibits trump the pleadings. See, e.g., *Crenshaw v. Lister*, 556 F.3d 1283, 2009 WL 279812 at *7 (11th Cir. 2009) (holding that "'when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern;'" quoting *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir.2007)); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) (holding that the contents of exhibit attached to pleading trumps inconsistent allegations in that pleading); *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002); *KKE Architects, Inc. v. Diamond Ridge Dev. LLC*, 2008 U.S. Dist. LEXIS 17127, 2008 WL 637602, *3 (C.D. Cal., Mar. 3, 2008) (citing *Thompson*).

[2] Courts have determined that banning sexually explicit materials, those that incite violence or those that threaten the internal security of the prison facility do not offend the Constitution. *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. Ariz. 1999); *Gaskins v. Clarke*, 2008 U.S. Dist. LEXIS 3150 (D. Mass. Jan. 16, 2008) (Banning R-and NC-17-rated movies is "rationally "connected to the valid penological goals of promoting prison security, rehabilitation and economy.")

[3] Courts have found that prisoners do not have a constitutional right to view sexually oriented material. *Jewell v. Gonzales*, 420 F. Supp. 2d 406, 438 (W.D. Pennsylvania 2006); *Waterman v. Farmer*, 183 F.3d 208 (3rd Cir. 1999).

Nevertheless, Plaintiff challenges the complete ban on movies rated "higher" than PG-13[4] and those that are unrated.  Plaintiff does not challenge the regulation insomuch as it bans movies that glorify violence or sex or are inflammatory to the climate of the facility but limits his challenge to the ban on movies "where the depictions of violence, sexual conduct or the nude human figure are incidental or integral to the films [sic] plot or are depictions with inherent educational, intellectual, historical or cultural value . . ." (Doc. 1 at 7)  Thus, the focus of Plaintiff challenge is his claim that the regulation is overbroad.  (Doc. 1 at 5)

   ***i.*  Even if reliance on the MPAA rating system excludes movies that do not interfere with penological goals, this does not render the regulation unconstitutional.**

Plaintiff objects that reliance on the MPAA rating system, in essence, militates against the rational relationship between the penological goal and the regulation.  He asserts that by relying on this rating system, CDCR officials "ceded governmental authority over prisoners' First Amendment rights to the MPAA."  (Doc. 1 at 6)  The Court disagrees.

The MPAA has been in existence since 1968.  (Doc. 1 at 11) Since this time, it has rated all movies submitted to it for the purpose of providing guidance to parental moviegoers. *Id*.  The MPAA defines an R-rated movie as one that "may include adult themes, adult activity, hard language, intense or persistent violence, sexually-oriented nudity, drug abuse or other elements . . ." (Doc. 1 at 13)  On the other hand, a rating of NC-17, "can be based on violence, sex, aberrational behavior, drug abuse or any other element that most parents would consider too strong and therefore off-limits for viewing by their children." *Id*.

The R rating is assigned to all movies where scenes of violence are realistic and extreme or are persistent.  (Doc. 1 at 13)  Any scenes of nudity are sexually oriented and, generally, are not merely brief.  *Id*.  An NC-17 rating is given to movies that contain scenes of violence or sex that are more extreme than in an R-rated movie.  *Id*.  Because these elements are the exact

---

[4]Ratings "higher" than a PG-13 rating include, R-, NC-17- and X-rated movies. (Doc. 1 at 11, 13)

depictions that the CDCR has determined threaten the "safety and security" of the institution (*Id.* at 25-26), reliance on this rating system is rationally related to the governmental interest.

The Court acknowledges that the R- and the NC-17 ratings, may be assigned to movies that contain no violence or sexuality.  (Doc. 1 at 13)  For example, an R-rating may be given to a movie because it contains "adult themes, adult activity [or] hard language" and an NC-17 may be given to a movie that "is patently too adult for . . . children."  *Id.*  However, the fact that reliance on the MPAA rating system may exclude materials that do not further the penological goals or that have intrinsic artistic or educational value, does not render the policy infirm.  The Ninth Circuit Court of Appeals has held,

> That the jail policy may exclude artistic or scientific journals does not render the policy unconstitutionally overbroad. As the Court held in *Thornburgh*, a prison regulation does not need to pass the 'least restrictive alternative test' to withstand constitutional challenge. *See* 490 U.S. at 414. Rather, as long as the regulation withstands the *Turner* reasonableness test, it will be deemed constitutional. See *id.*

*Mauro,* 188 F.3d at 1060, citing *Thornburgh v. Abbott*, 490 U.S. at 414 (1989).  Moreover, "a more closely tailored standard 'could result in [showing of movies] which, even if they did not lead directly to violence, would exacerbate tensions and lead indirectly to disorder.'" *Thornburgh,* at 416. Thus, the breadth of the regulation does not render it constitutionally infirm.[5]  *Jewell v. Gonzales*, 420 F. Supp. 2d 406, 435 (W.D. Pa. 2006) ("We conclude that the use of the R-rating as a screening tool is rational within the context in which it is utilized by the BOP.")

To be sure, the ban means that unedited R-, NC-17- and X-rated[6] movies will not be shown. However, the regulation creates a procedure by which inmates may present specific

---

[5] "Moreover, it 'does not matter whether we agree with' the defendants or whether the policy 'in fact advances' the jail's legitimate interests. See *Amatel*, 156 F.3d at 199. The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests. See *id.*"  *Mauro*, 188 F.3d at 1060.

[6] Section 101040.4.6 of the Department of Corrections and Rehabilitation Operations Manual provides, in relevant part, "Only movies/videos with a Motion Picture Association of American (MPAA) rating of General (G), Parental Guidance (PG)m or Parental Guidance (PG-13) may be considered for general viewing by the inmate population. Movies/videos with Specially Edited Down (SED) rating may be viewed in accordance with the provisions in this section."

1  unrated movies or those not rated PG-13 or "below" for an individualized determination whether

2  the movie may be shown.  § 3220.4(d)(1)-(3).

3      However, Plaintiff complains that the appeal procedure does not provide proper

4  consideration and that his appeal in particular, that all movies listed on the National Film

5  Registry and other, specifically identified movies[7] be permitted to be shown, was not adequately

6

7      [7]Notably, the movies identified, <u>The Deer Hunter</u>, <u>Saving Private Ryan</u>, <u>Apocalypto</u>, <u>Cold Mountain</u>, <u>No Country for Old Men</u> and <u>The Passion of the Christ</u> all depict graphic scenes of violence and/or sexually explicit conduct.

8  On the other hand, <u>Paper Moon</u> is rated "PG" and is not presumptively banned by the statute. Of these films, only <u>The Deer Hunter</u> is listed on The National Film Registry.  Following are summaries of four of the R-rated films Plaintiff

9  sought to be shown:

10  <u>Apocolypto</u> - "The MPAA has rated this film "R" for graphic violence and disturbing images. The film features many

11  sequences of brutally graphic violence including murder and assault by spear, blunt object, knives, arrows, catapult, animal attacks and brute force. Graphic gore and bloodshed are frequent. Numerous people are viciously slain. One man

12  is bludgeoned to death and another dies from having his throat slit. Masses of bloodied corpses are depicted in several scenes, often dismembered and at times numbering in the hundreds. The film includes scenes that graphically portray

13  multiple human sacrifices where captives on the temple altar have their hearts cut out. Women are depicted using the corpse's blood to mark their children in some sort of religious ritual. Other scenes feature killing of individuals for sport

14  by spears, rocks and arrows. A man's face is brutally devoured by a black panther. Suicide is committed by at least one dying warrior. Slavery is graphically depicted. Hunters eat animal parts, including their genitals, directly out of a fresh

15  kill.. Male and female partial nudity is shown as the native dress, including breastfeeding mothers, and also as a result of captivity."

16  <u>Cold Mountain</u> - "The MPAA has rated this movie "R" for violence and sexuality. The hardship of war is evident in

17  every scene. Strong language including profanity occurs infrequently. War violence is prevalent throughout this movie, including the atrocities of the battlefield, torture, rape and starvation. Sexuality including nudity is portrayed in three

18  scenes. These scenes range from brothel and rape to sweethearts in a long-awaited reunion."

19  <u>Saving Private Ryan</u> - "The MPAA rates this movie "R" for intense graphic sequences of war violence and language.

    Occasionally, strong swear words are used in very extreme situations. There is a good deal of war violence shown in

20  detail on screen. The first 20 minutes of the movie are very intense. The men storm Normandy. The war injuries and casualties are extremely explicit. Nothing is held back in this depiction. A second lengthy battle is included, as well as

21  several minor skirmishes. Some of the deaths become personal. Viewers also get a good picture of how the war personally affected the ordinary people involved. It may be the visuals, emotional connections, and moral questions this

22  story delivers that will capture the viewers attention.

23  <u>The Passion of Christ</u> - "The MPAA has rated this movie "R" for violence. Throughout this movie the main character

    is subjected to several forms of intense violence, including beating, scourging, abusive and false accusations, spitting

24  and insults hurled by an angry mob. During and after a particularly harsh beating, viewers see great amounts of blood on the main character's body and on the ground surrounding him. Some of the soldiers administering the beating become

25  sadistically obsessed with their task and the beating becomes more intense. The main character offers no defense for himself, nor does he fight back. Beaten and bleeding, he must carry a large wooden cross to the place where criminals

26  are put to death. During this walk, he falls down repeatedly and is subjected to more verbal and physical abuse from the soldiers and the crowd. As he is prepared for crucifixion, extremely graphic close-ups of large spikes being pounded

27  through his hands and feet, and into the wooden cross, are shown. Scenes of intense violence and brutality are interrupted by calm, serene flashbacks of the main character's earlier life showing his kindness to others. A man cuts off another

28  man's ear with a sword and the main character puts the ear back in place and it is miraculously healed. The image of the devil appears frequently. Demons appear in several scenes, sometimes in the form of children who follow and verbally torment a man. A man hangs himself with a piece of rope from a tree."

1  reviewed.  (Doc. 1 at 23-26, 39-41.)  His concern seems centered on the fact that the regulation

2  grants the CDCR the power to exercise discretion how and whether to review a submitted movie.

3  His specific concerns about how his appeal was handled are discussed *infra*.

4       Section 3220.4(d) states, "At the discretion of the director, a movie/video review shall be

5  done by the movie review committee, composed of staff named by the director."  § 3220.4(d).

6  "Movies/videos which have an MPAA rating of other than 'G,' 'PG,' or 'PG-13[]' . . . may be

7  submitted to the director by the facility reviewer or a contract vendor for the committee's

8  consideration[.]"  § 3220.4(d)(2).  "Movies which are . . . appealed by inmates . . . shall be

9  reviewed by the committee at the director's discretion."  § 3220.4(d)(3).  If a specific movie is

10  reviewed, the committee will then decide whether it is "unacceptable for inmate viewing,

11  acceptable for general inmate viewing, or acceptable for specified limited inmate viewing

12  purposes."  § 3220.4(e).  Therefore, the Director and the facility reviewer retain the discretion to

13  determine that the suggested movie should not be reviewed.  For example, the Director and the

14  facility reviewer need not review a movie that is described as containing "graphic gore" such as

15  Apocalypto.

16       "Where the regulations at issue concern the entry of materials into the prison, . . . a

17  regulation which gives prison authorities broad discretion is appropriate."  *Thornburgh*, at 416;

18  *Mauro v. Arpaio*, 188 F.3d at 1060 n. 5 ("As the Court made clear in *Thornburgh*, regulations

19  which give broad discretion to prison authorities are appropriate where the regulations concern

20  materials coming into a prison.")  Thus, the fact that the Director and the facility reviewer may,

21  but is not required to, review movie requests does not render the regulation unconstitutional.

22       On the other hand, inmates are permitted to suggest non-banned movies to be shown

23  outside of the appeal process.  (Doc. 1 at 23-24)  These movies are voted on by the inmate

24  population in order to select a movie that most inmates wish to view.  *Id*.  Plaintiff contends that

25  this is a violation of his First Amendment rights because, apparently, he believes that he should

26  be permitted to dictate to the other inmates what movie they will view.  Not so.  *Turner,* 482 U.S.

27

28  ───────────────
   http://moviereports.com/archives.cfm

at 90.   For all of these reasons, the Court concludes that reliance on the MPAA system is reasonable even though it may exclude movies that do not further penological goals.

### b.   There are alternative means of exercising the right.

In determining whether the regulation is reasonable, the Court must determine whether other avenues exist to the inmate to exercise the right, if the regulation is upheld.   To consider this factor, "the right in question must be viewed sensibly and expansively." *Mauro v. Arpaio*, 188 F.3d at 1061 citing *Thornburgh*, 490 U.S. at 417.

In *Jewell v. Gonzales*, 420 F. Supp. 2d at 438, the court considered the very question presented here and defined the issue as a right to receive information through movie.   The court held,

> Plaintiffs do not have a First Amendment right to R-rated movies *per se.* Instead, Plaintiffs' First Amendment right, most narrowly defined, is the right to receive information and ideas through a broad range of movies. Here, the record here is uncontradicted that Plaintiffs have access to films that are rated G, PG, and PG-13, as well as programming available on cable television, including non-premium channels such as the American Movie Classics.

*Id.*

The ban applies only to movies and only to those that have a "higher" MPAA rating than PG-13.   It does not prohibit written publications that  contain material or concern topics that would justify an "R" rating, if they were a movie. See *Amatel v. Reno*, 332 U.S. App. D.C. 191, 156 F.3d 192, 197-98 (D.C. Cir. 1998); 156 F.3d at 202 ("The regulation by its terms only restricts pictures; a prisoner may read anything he pleases.") Therefore, there are alternative means to exercise the right.  *Mauro*, 188 F.3d at 1061.

### c.   The impact that accommodation of the asserted constitutional right will have on others is great and there are no easy alternatives to the regulation.

"In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner,* 482 U.S. at 90.

1    As noted above, Plaintiff seeks to be permitted to select movies for the inmate population

2    rather than allowing them to vote on selected movies.  First, to accommodate Plaintiff's claim,

3    prison officials would be required to view every film, no matter how graphic, sexually explicit or

4    inflaming to the prison population to determine whether the artistic or educational value

5    outweighs the violence, sex or inflammatory message depicted in the film.  By definition, this

6    would convert the regulation from one that is content-neutral to one that, necessarily, would be

7    content based.

8    Alternatively, the review would require prison officials to evaluate each prisoner's

9    "ability" to watch certain films. For example, it cannot be seriously argued that an inmate who

10   was convicted of rape should be permitted to watch films depicting rape scenes[8].  Likewise, a

11   person convicted of crimes of violence should not be permitted to watch movies that glorify these

12   acts.  Finally, movies that belittle or denigrate an ethnic class should not be shown to those who

13   are known to persecute others of different races given the likely violence that would result, for

14   example.  Moreover, to exclude particular inmates from viewing certain movies would require,

15   for example, implicitly identify them to the general population despite that this could place the

16   inmates in grave danger , i.e. a sex offender.

17   On the other hand, Plaintiff suggests that his First Amendment rights are superior to those

18   of his fellow inmates by suggesting that, despite the fact that they did not vote for his requested

19   movie, it should be shown even still.  Thus, to fully vindicate Plaintiff's First Amendment rights,

20   the rights of the other inmates are diminished.  Due to this "ripple effect," the Court must defer to

21   the prison officials' determination about the best method to select movies.  Thus, Plaintiff

22   challenge in this regard, fails.

23                    **d. There are no easy alternatives to the regulation.**

24   Plaintiff's suggestion that all of the movies on the National Film Registry be allowed to

25   be shown, ignores the graphic nature of many of the movies listed (i.e., <u>Alien</u>, <u>Apocalypse Now</u>,

26

27   _____

28       [8]Allowing sexually explicit material to be assessed by inmates has been found in this Circuit to place
     correctional officers at risk of sexual harassment. *Mauro*, 188 F.3d at 1059.

Halloween[9]) and leads to a more arbitrary determination of the allowable movies than reliance

upon the MPAA.  "[O]bvious, easy alternatives may be evidence that the regulation is not

reasonable, but is an 'exaggerated response' to prison concerns. . . . But if an inmate claimant can

point to an alternative that fully accommodates the prisoners rights at de minimis cost to valid

penological interests, a court may consider that as evidence that the regulation does not satisfy

the reasonable relationship standard." 482 U.S., at 90-91. *Thornburgh*, 490 U.S. at 418.

Thus, Plaintiff's suggestion that an easy alternative to the regulation is to add to the

regulation such to allow the movies listed on the National Film Registry to be shown, is not well-

taken and does not demonstrate that the prison officials' have made an exaggerated response to

the problems sought to be addressed by the regulation.[10]   Likewise, the suggestion that all moves

be presumptively allowed to be shown unless they are shown to glorify violence or sex or

inflame the prison population would require the prison to spend limited resources watching every

movie produced.  This is an excessive burden on an already cash-strapped system.  Thus, the

Court does not find that there is an easy alternative to the regulation.

### e. Conclusion

For the reasons set forth above, the Court finds the regulation to be reasonable and, while

overbroad in some respects, not unconstitutional.  Consequently, Plaintiff fails to state a

cognizable First Amendment claim against any of the defendants.

///

///

---

[9]For example, as to the movie Halloween, "The MPAA rates the film 'R' for strong violence, terror, sexual content, nudity and language. A 10-year-old boy tortures and kills animals. The boy expands his hit list to include a class bully whom he beats to death with a club. A man's head is beaten into a pulp with an aluminum baseball bat. A man's throat is slit and he is watched as he dies. Teenagers are stabbed, slashed, and beaten. Handguns and a shotgun are used. Sprays and splashes of blood accompany each murder. Victims are shown dying in most cases. Victims are seen running and screaming, begging for their lives. Teenage, unwed couples are shown under covers or in shadows engaging in sex acts. Women's bare breasts are shown in many scenes. A pornographic magazine is displayed to show full frontal nudity. Strong and profane language is heard throughout. Slang and derogatory remarks are frequently used. Alcohol, tobacco and drugs are used."

http://moviereports.com/archives.cfm

[10] In addition, prison officials cannot be expected to expend precious resources in reviewing each of the movies on the Library of Congress' National Film Registry to determine whether they should be permitted.

### C.  Fourteenth Amendment Protections – Due Process

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  In order to state a cause of action for deprivation of due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought.  *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).  "States may under certain circumstances create liberty interests which are protected by the Due Process Clause[,]" "[b]ut these interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.*

### 1.  Plaintiff's Fourteenth Amendment Claims

Plaintiff asserts Junious "merely submitted Plaintiff's requests to the movie specialist for review," rather than submitting them "for meaningful consideration."  (Doc. 1 at 6.)  Plaintiff further alleges Cate could have granted Plaintiff's grievance and requests, but elected not to, denying his grievance in all respects.  (*Id.*)  Even taken as true, these factual allegations do not rise to the level of a constitutional violation.

Notably, Plaintiff *does not* have the right to appeal *to local prison officials* about the refusal of these officials to show a R-rated or higher rated movie.  Likewise, the appeal process is <u>not</u> to request that a particular, non-banned movie be shown.  Instead, appeals to local prison officials are limited to challenges to the refusal to show a movie, rated PG-13 or lower that is otherwise banned by the prison or an unrated movie.  In this way, individual prison officials do not have the authority to deviate from the movies approved by the Director.  Title 15 of the California Code of Regulations, section 3084.7(b)(2) provides,

> Movies/videos that have been given a rating of other than "G", "PG", or "PG-13" by the Motion Picture Association of America are not approved for either general inmate viewing pursuant to section 3220.4 or for viewing within the classroom, and will not be accepted for appeal at any level. The first level shall be waived for appeals related to the selection or exclusion of a "G", "PG", or "PG-13" rated or non-rated movie/video for viewing and the second level response shall constitute the department's final response on appeals of this nature.

On the other hand, as to all banned movies, Plaintiff's appeal may be, but is not required to be, submitted to the Director to consider whether the specific movie at issue may be shown.  §

1   3220.4(d)(2).  ("Movies/videos which have an MPAA rating of other than 'G,' 'PG,' or 'PG-

2   13[]' . . . may be submitted to the director by the facility reviewer or a contract vendor for the

3   committee's consideration[.]")

4        Here, Plaintiff's appeal related to specific R-rated movies and one non-banned PG-rated

5   film.  As to the non-banned PG-rated film, the appeal was not proper.  As to the R-rated films, at

6   the first level of his amended appeal, the request to see these R-rated movies was denied, based

7   upon the lack of authority to grant the appeal, but it was referred for review to the facility's

8   media specialist.  (Doc. 1 at 23).  This would be the first step toward submitting it for review by

9   the Director. § 3220.4(d)(2).  Likewise, at the first level of his original appeal, Plaintiff's request

10  was forwarded to the Institutional Movie Review Committee for its consideration whether it

11  would seek the Director's permission to allow viewing of the movies for a limited purpose.  *Id* at

12  25.  As noted above, the fact that this process has inherent discretion is important but, as to

13  Plaintiff's appeals, the facility agreed to exercise this discretion.  There are no factual allegations

14  showing that this process did not or does not, in fact, yield "meaningful review" other than

15  Plaintiff's disagreement with the result.  The fact that the facility did not simply forward the

16  appeal to the Director does not render the appeal process unconstitutional according to either

17  Fourteenth or First Amendment standards, as noted above.

18        On the other hand, "'[A prison] grievance procedure is a procedural right only, it does not

19  confer any substantive right upon the inmates,'" *McCullock v. Yates*, 2008 U.S. Dist. LEXIS

20  49808, at *1 (E.D. Cal. June 27, 2008) (quoting *Buckley*, 997 F.2d at 495) (emphasis omitted), or

21  "give rise to a protected liberty interest requiring the procedural protections envisioned by the

22  Fourteenth Amendment." *Azeez v. DeRobertis*, 568 F.Supp. 8, 10 (N.D. Ill. 1982).  Additionally,

23  "prisoners do not have a 'separate constitutional entitlement to a specific prison grievance

24  procedure.'" *Davis v. Martel*, 2011 U.S. Dist. LEXIS 56319, at *7 (E.D. Cal. May 25, 2011)

25  (quoting *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003)).  Thus, actions in reviewing a

26  prisoner's administrative appeal cannot serve as the basis for liability under § 1983, *Buckley v.*

27  *Barlow*, 997 F.2d 494, 495 (8th Cir. 1993), and even the failure of prison officials to properly

28  implement an appeal procedure does not raise constitutional concerns, *Mann v. Adams*, 855 F.2d

1    639, 640 (1988).  Consequently, Plaintiff has failed to state a cognizable Fourteenth Amendment

2    claim against any of the defendants.

3    **V.  Conclusion and Order**

4         Based on the foregoing, the Court finds Plaintiff failed to state a claim for relief under §

5    1983.  Specifically, Plaintiff failed to allege facts indicating Defendants violated his First or

6    Fourteenth Amendment rights.  Because the regulation is supported by legitimate penological

7    reasons and permits a review process, and there is no due process right to have your grievance

8    handled in a specific manner, the deficiencies of Plaintiff's Complaint cannot be cured by

9    amendment.  Therefore, the Court will not provide Plaintiff with the opportunity to file an

10   amended complaint.  *See Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

11        Accordingly, it is **HEREBY ORDERED** that:

12        1.     Plaintiff's Complaint is **DISMISSED**, without leave to amend.

13   IT IS SO ORDERED.

14   Dated:   **July 6, 2011**                                **/s/ Jennifer L. Thurston**

15                                            UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28